William Gordon BROOKS,
Plaintiff–Appellant,

v.

AMERICAN BROADCASTING COMPANIES, INC.; Geraldo Rivera; Charles C. Thompson; and Maravilla Production, Inc., Defendants–Appellees.

No. 91–3948.

United States Court of Appeals,
Sixth Circuit.

Argued May 5, 1993.

Decided July 20, 1993.

David L. Jamison, John L. Wolfe (argued and briefed), Akron, OH, for plaintiff-appellant.

Carolyn K. Seymour, Elizabeth A. Rader, Terence J. Clark (argued and briefed), Squire, Sanders & Dempsey, Cleveland, OH, for defendants-appellees.

Before: RYAN and NORRIS, Circuit Judges; and PECK, Senior Circuit Judge.

RYAN, Circuit Judge.

Plaintiff William Brooks appeals from the district court's directed verdict and partial summary judgment for defendants in this diversity action alleging libel and slander in the broadcast of a weekly television news program. Brooks raises the following issues:

1. Whether the district court erred in deciding a motion for directed verdict under Fed.R.Civ.P. 50(a) based on state, rather than federal, substantive law.

2. Whether the district court erred in granting a directed verdict to the defendants.

3. Whether the district court erred in suppressing the plaintiff's expert witness testimony designed to show the journalistic standard of care applicable to the defendant network news organization.

4. Whether the district court erred in granting partial summary judgment to the defendants as to the videotape footage of the plaintiff's flight from defendant Geraldo Rivera.

Finding no reversible error in the district court's disposition of these issues, we shall affirm.

## I.

This dispute arises from the broadcast of a report entitled "Injustice for All" on ABC's weekly news program *20/20.* The gist of Brooks's complaint is that he was falsely labled a "hit man" on this program by *20/20*'s reporter, Geraldo Rivera. The following factual background is taken largely from *Brooks v. American Broadcasting Cos.,* 737 F.Supp. 431 (N.D.Ohio 1990) (*Brooks I* ), and this court's opinion in *Brooks v. American Broadcasting Cos.,* 932 F.2d 495, 496–97 (6th Cir.1991) (*Brooks II* ).

Television personality Geraldo Rivera, at the time a reporter for ABC's weekly program *20/20,* traveled to Akron, Ohio, in early 1980 to investigate rumors that an Ohio state judge, James Barbuto, persuaded several women to have sex with him by offering them favorable rulings in certain cases. Rivera apparently was tipped off by two Akron police officers that Brooks, an Akron resident with a substantial criminal background, was

assisting Judge Barbuto by attempting to frighten the women so that they would not testify against Barbuto if he were criminally charged.

Rivera persuaded Brooks to meet with him at an Akron hotel on April 1, 1980. As soon as Brooks got out of his taxi in front of the hotel, Rivera appeared with a camera and audio crew and began barraging Brooks with a series of questions concerning Brook's suspected role as a "hit man" for the judge. After this questioning, and after muttering some obscenities, Brooks fled, with Rivera and the camera crew in hot pursuit.

On ABC's April 17, 1990 broadcast of 20/20, excerpts from Rivera's questioning of Brooks were aired. The "Injustice for All" report also included negative comments from other persons concerning Brooks and his alleged involvement with Barbuto. These individuals, principally the women who had been the targets of Brooks's alleged intimidations, referred to Brooks variously as a "hit man," "pimp," "muscleman," "street knowledgeable jive turkey," and that he was "betrayed" by the judge. In all, five persons spoke about Brooks's involvement with the judge.

Before the broadcast of the 20/20 segment, a grand jury had indicted both Brooks and Barbuto on charges related to obstruction of justice arising from the witness intimidations and other charges. Brooks pleaded guilty to the obstruction of justice charges and was subsequently convicted. He is now serving a 19 year prison sentence for obstruction of justice, and for unrelated convictions for felonious assault and possession of a firearm.

Over the years, police had taken Brooks into custody 20 times on suspicion of various misdeeds, several of which resulted in formal charges for which he was convicted. Adverse publicity had also severely compromised Brooks's reputation prior to the 20/20 broadcast. The Akron Beacon Journal publicized Brooks's convictions in four articles. In addition to reporting the convictions, the Beacon Journal also noted Brooks's "involvement" in a 1979 Akron slaying. Ten days before the 20/20 broadcast, the newspaper reported Brooks's indictment for intimidation of witnesses and obstruction of justice in relation to the judge, referring to Brooks as

"[t]he man police suspect as being the so-called 'hit-man' in the sex case involving [Judge Barbuto]...."

Former Judge Barbuto was charged with 26 offenses, including: assault with intent to commit rape, obstruction of justice, intimidation, keeping a place for prostitution, and several counts of bribery. Barbuto was subsequently convicted on all charges and is now serving a prison sentence.

In 1981, Brooks filed a complaint in the United States District Court for the Northern District of Ohio, invoking diversity jurisdiction, and alleging that Rivera, producer Charles Thompson, Maravilla Production, Rivera's company, and ABC libeled him by broadcasting derogatory and allegedly false remarks. Brooks sought $20 million in compensatory damages and $20 million in punitive damages. Brooks then sought to amend his original complaint to allege violations of 18 U.S.C. § 2511, unlawful use of electronic devices to intercept statements, and 42 U.S.C. §§ 1981, 1985, deprivation of constitutional rights. Brooks continued to seek $40 million in damages, as well as attorneys' fees.

The defendants filed a motion for summary judgment. The district court denied Brooks's motion to amend, and granted summary judgment for defendants with respect to the claims in the original complaint. The district court found that Brooks's reputation was so tarnished that a recovery for injured reputation was precluded. Brooks appealed to this court from the summary judgment and from the denial of his motion to amend.

In Brooks II, we affirmed the district court's denial of Brooks's motion to amend, agreeing that Brooks failed to state actionable claims for his civil rights actions or for violation of statutes prohibiting the recording of private oral communications. However, we reversed the district court's summary judgment on the state libel count, holding that the district court erred in granting summary judgment to the defendants based on its determination that Brooks's reputation was so tarnished as to preclude recovery. We held that such a determination was a question for the jury, and stated further that

the district court may conclude that a trial is necessary to resolve the question of Brooks's libel-proofness. On the other hand, the district court may grant summary judgment for defendants on the basis of one or more of the several alternative grounds, not based upon the libel-proof concept, that defendants have advanced.

*Brooks II,* 932 F.2d at 502.

On remand, the defendants moved for summary judgment on several of these "alternative grounds." They contended that the allegedly defamatory statements were protected by the fair report and neutral report privileges, that the gist of the statements was true, and that the visual image of Brooks fleeing from the cameras was not a basis for a cognizable defamation claim. While denying the rest of the defendants' motions for summary judgment, the district court granted summary judgment as to the visual image claim, ruling that the visual image of Brooks fleeing could not be a basis for a defamation claim.

On September 5, 1991, the remaining issues in the case went to trial. At the conclusion of Brooks's evidence, the defendants moved for a directed verdict on the grounds that a reasonable fact finder could not conclude that Brooks had proven fault—an essential element of his case. The district court granted the motion.

Brooks perfected a timely appeal, challenging the district court's grant of partial summary judgment, and its directed verdict for the defendants.

## II.

### A.

Brooks's first assignment of error is that the district court erred by applying the Ohio law governing the entry of directed verdicts. While Brooks concedes that the case law of this circuit supports the district court's analysis, he urges this court to hold that when assessing a motion for a directed verdict in a diversity case, this court should apply the federal standard of sufficiency of the evidence, not its state law counterpart.

The defendants contend that the district court correctly applied Ohio law in deciding the question of sufficiency of the evidence in the wake of the motion for directed verdict. They point to our recent decision in *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.,* 955 F.2d 1043 (6th Cir.1992).

### B.

■ Application of substantive and procedural law by the district court is a legal determination that we review de novo. *Cf. Smith v. Commissioner,* 937 F.2d 1089, 1096 (6th Cir.1991).

■ While the circuit courts have not adopted a uniform approach to the application of directed verdict law, in this circuit the rule is well settled. This court has repeatedly held that the law governing the legal analysis for directed verdict motions in federal diversity cases is state law. *See, e.g., Miller's Bottled Gas,* 955 F.2d 1043, 1050; *O'Neal v. Burger Chef Sys., Inc.,* 860 F.2d 1341, 1347 (6th Cir.1988); *Gold v. National Sav. Bank of Albany,* 641 F.2d 430, 434 (6th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981); *Lones v. Detroit, Toledo & Ironton R.R. Co.,* 398 F.2d 914, 918–19 (6th Cir.1968), *cert. denied,* 393 U.S. 1063, 89 S.Ct. 714, 21 L.Ed.2d 705 (1969). Under this court's cases, Brooks's argument is therefore without merit.

## III.

### A.

Brooks next contends the district court erred in granting the defendants' motion for directed verdict. He argues that evidence was introduced that showed that the defendants fabricated the hit man story, and that a jury could reasonably conclude that they thus were motivated by malice, or acted negligently.

The defendants, in contrast, maintain that no evidence of negligence or actual malice was introduced, and that the district court thus correctly granted their motion.

### B.

When hearing an appeal in a diversity case, this court must apply the state's standard when reviewing a lower court's grant of a directed verdict. *Briney v. Sears, Roebuck & Co.,* 782 F.2d 585, 587 (6th Cir. 1986). The Ohio civil rule governing the standard for granting a directed verdict motion states in full:

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Ohio R.Civ.P. 50(A)(4). In order to avoid an adverse directed verdict ruling, a plaintiff must have produced evidence which supports every element essential to establish liability, or produce evidence of a fact upon which a reasonable inference may be predicated to support such element. *Strother v. Hutchinson,* 67 Ohio St.2d 282, 284, 423 N.E.2d 467 (1981) (per curiam).

In this court's review of the district court's grant of directed verdict, this court must

determine, when viewing the evidence in the light most favorable to the appellant[ ], whether [he] presented some evidence on every element of [his claim] or whether reasonable minds could reach only the opposite conclusion.

*Briney,* 782 F.2d at 587.

Under Ohio law, a private individual asserting a defamation claim against a media defendant

must prove by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication.

*Lansdowne v. Beacon Journal Publishing Co.,* 32 Ohio St.3d 176, 180, 512 N.E.2d 979 (1987). The Ohio Supreme Court went on to state that "clear and convincing evidence" is

"that measure . . . of proof which is more than a mere 'preponderance of evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*Id.* at 180–81, 512 N.E.2d 979 (citation omitted). The *Lansdowne* court explicitly noted that in private figure/media defamation cases, "actual malice need not be proven." *Id.* at 181, 512 N.E.2d 979. Thus, under Ohio law, a private defamation plaintiff need only show negligence on the part of the defendant, but this negligence must be shown by clear and convincing evidence. *Id.* at 182, 512 N.E.2d 979 (Douglas, J., concurring).

In this case, Brooks offered little in the way of clear and convincing evidence of negligence. We can find no evidence—let alone that of a clear and convincing type—introduced by Brooks relevant to defendants ABC, Thompson, or Maravilla Production, and their alleged negligence.

As to defendant Rivera, Brooks's chief evidence largely consists of his own testimony that at a meeting at the Tangiers Restaurant on March 28, 1980, he and Rivera had the following conversation:

Mr. Rivera said to me, "Bobie, I know you're not a hit man," he said, "but I believe you have some information that can help me put my story together." And I told him, I said, "Mr. Rivera, I don't know anything about this mess. All I had was a gun charge and now I'm in the middle of this."

He said, "Well, I think that you're being used, Bobie, and I would like for you to give me the story."

Brooks also testified that during a telephone conversation after the *20/20* broadcast, he asked Rivera why Rivera had "double-crossed him." According to Brooks, Rivera replied, " 'Bobie, I'm very sorry but I needed you for my story.' "

While the Tangiers Restaurant conversation might aid Brooks's cause, it is important to point out that these remarks were made

on March 28, 1980. The broadcast of the *20/20* segment was on April 17, 1980. Under Ohio law, "actual malice is to be measured as of the time of publication." *Varanese v. Gall,* 35 Ohio St.3d 78, 80, 518 N.E.2d 1177, *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2849, 101 L.Ed.2d 886 (1988). While the actual malice standard is not applicable to this case, the timing of the analysis under negligence should be the same. In the nearly three weeks between the Tangiers Restaurant conversation and the broadcast, Brooks was indicted for intimidation of witnesses and obstruction of justice in the Barbuto case, and Barbuto was indicted on numerous counts, including a charge of obstruction of justice and complicity to commit intimidation of witnesses in combination with Brooks. These intervening events strongly buttressed the statements later broadcast on *20/20,* and Brooks introduced no evidence of Rivera's state of mind between the Tangiers Restaurant meeting and the broadcast.

Brooks's later telephone conversation with Rivera is anything but clear and convincing evidence of negligence. Rivera's limited comments do not demonstrate that his report was intentionally misleading or that he failed to investigate its truthfulness. Moreover, both the content of the Tangiers conversation and the later telephone conversation are the product of Brooks's own testimony. As the district court stated:

> There may be evidence that some of the statements that were made could be construed to be defamatory. But when we come down to the test as to whether or not a person is liable for libel in this kind of case, there isn't any evidence that rises to the level that I could submit to a jury and sustain if the jury were to find in favor of the plaintiff ... [I]t would not ... meet the minimum standard of what the jury could hold to be clear and convincing....

As with a summary judgment analysis, the district court was not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question. *See Comfort Trane Air Conditioning Co. v. Trane Co.,* 592 F.2d 1373, 1383 (5th Cir. 1979).

Likewise, the trial testimony of persons interviewed for the "Injustice For All" program falls far short of clear and convincing evidence of negligence on the part of the defendants. Brooks points to these persons' testimony as evidence supporting his claim, and contends that they reveal that the defendants invented the "hit man" story. Our examination of this testimony—particularly in the light of earlier videotaped interviews—reveals just the opposite. At the time immediately preceding the broadcast of "Injustice For All," the women interviewed by Rivera said they feared for their lives, and Brooks and Barbuto were the men they feared.

Sandra Boddie, in her videotape interview with Rivera on March 19, 1980, said she feared speaking about Barbuto because if she did, "all of us was going to be found dead somewhere for testifying or saying somethin' against Barbuto." She also told Rivera that Brooks "[told] me to tell Arenthia [Wims] that ... something would happen to [Wims if she spoke to the FBI about Barbuto]."

Wims also told Rivera, during a videotaped interview, about threats she had received. While she did not name the person who threatened her, at trial she admitted that the only person to whom she had spoken about Barbuto was Brooks.

Both Boddie's and Wims's taped interviews must also be viewed in the context of the arrests of Brooks and Barbuto. It must be remembered that after the interviews, but before the broadcast, Brooks and Barbuto were arrested on the very charges that the defendants suspected, and to which Boddie and Wims had alluded. Furthermore, the *Akron Beacon Journal* articles specifically identified Brooks as a "hit man," before the *20/20* broadcast. Any testimony given by Boddie and Wims in the district court trial, nearly ten years after the taped interviews, is not particularly relevant to the defendants' state of mind *before the broadcast,* particularly in the wake of the Boddie and Wims videotaping, the arrests of Brooks and Barbuto, and the *Akron Beacon Journal* articles identifying Brooks as the "hit man," all of which occurred immediately before "Injustice For All" was aired.

Contrary to Brooks's assertions, the newspaper articles substantiate the defendants' claim that their story was truthful. Moreover, the defendants knew in advance of the broadcast that Brooks had been given a list by Barbuto with five women's names, and that at least two of the women, Boddie and Wims, had been threatened, and that Boddie identified Barbuto as the threatener. This evidence falls far short of proving negligence. Brooks failed to demonstrate by clear and convincing evidence that the defendants acted negligently in their publication of the *20/20* segment.

## IV.

### A.

Brooks next argues that the district court erred by not allowing his experts to testify as to the journalistic standard of care applicable to the defendants. He argues that, assuming he did not make out his prima facie case, it was error for the district court to exclude his proffered experts.

The defendants, in contrast, contend that the district court was well within its discretion in excluding the experts proffered by Brooks. According to the defendants, since the subjective state of mind of the defendants was at issue, the experts' testimony could not be helpful. Moreover, the defendants maintain that even if the district court erred on this point, Brooks still would not have introduced evidence sufficient to get his case to a jury.

### B.

■ Ordinarily, this court reviews a district court's decision to exclude expert testimony only for an abuse of discretion, *United States v. McLernon,* 746 F.2d 1098, 1115 (6th Cir.1984), although, in an appropriate case, the standard of review could be de novo. Here, the specific error assigned—refusal to permit expert testimony—was a matter of trial court discretion.

■ The admissibility of expert testimony is a matter of federal, rather than state, procedure. Therefore, whether an expert should be permitted to testify is controlled by federal law. *Salas v. Wang,* 846 F.2d 897, 900 (3d Cir.1988). The Federal Rules of Evidence grant the district court considerable discretion with respect to whether expert testimony is permitted. Rule 702, which governs this inquiry, provides that a district court may choose to admit the testimony of experts when it "will assist the trier of fact to understand the evidence." Fed.R.Evid. 702.

■ Here, the district court declined to allow the experts to testify. The court determined that since the standard in this case was only ordinary negligence, not a professional negligence standard, the experts' testimony would not be helpful to the jury.

In *Lansdowne,* the Ohio Supreme Court explicitly rejected the plaintiff's contention that media defendants in libel actions should be held to a professional malpractice standard, stating instead that "we refuse to abandon the ordinary negligence standard." *Lansdowne,* 32 Ohio St.3d at 180, 512 N.E.2d 979. Moreover, in *Grau v. Stachewicz,* No. 50125, 1986 WL 1916 (Ohio App. Feb. 13, 1986), where the Ohio Court of Appeals was presented with a case and expert testimony issue precisely the same as that presented by Brooks, the court stated:

> [T]he issues presented in this case required the jury to decide the meaning of words which were in their experience to interpret, and whether [the defendants] had published those words with a particular state of mind. *When such questions are within the common knowledge of laymen, no expert is necessary.*

*Id.* at *6 (emphasis added).

We acknowledge that the district court could have decided to admit expert testimony; however, its conclusion not to do so was not an abuse of discretion, given the nature of the proposed testimony and the standard of proof involved.

## V.

### A.

Brooks's final assignment of error challenges the district court's grant of partial summary judgment on his visual image claim. He contends that the videotape of his

flight from Rivera, coupled with Rivera's barrage of leading questions, is an actionable libel. Brooks relies on two cases to support his contention: *Clark v. American Broadcasting Cos.*, 684 F.2d 1208 (6th Cir.1982), *cert. denied*, 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983), and *Morrell v. Forbes, Inc.*, 603 F.Supp. 1305 (D.Mass.1985).

The defendants contend that Brooks is raising this issue for the first time on appeal. Moreover, they argue, this argument is Brooks's third attempt to recover under his visual image theory, and that this court's previous adjudication of the same facts precludes Brooks from making this argument. Finally, ABC and Rivera contend that even if this court looks to the *Clark* and *Morrell* cases, Brooks's argument for reversal fails.

### B.

■ We review a grant of summary judgment de novo. *Klepper v. First Am. Bank*, 916 F.2d 337, 341 (6th Cir.1990). Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Brooks challenges the district court's holding that a videotape segment showing him fleeing from Rivera, accompanied by Rivera's leading questions labeling him a hit man, were not actionable libel. The relevant videotape segment depicted Brooks running from Rivera and his camera crew toward Brooks's lawyer's office. At the same time Brooks is shown fleeing, Rivera shouts:

> You threatened those women that if they testified against the Judge, you'd—you'd end them up in a ditch, didn't you?
>
> . . . .
>
> Five separate witnesses, all sayin' that you're the guy. That Judge Barbuto called you into his office. They're sayin' that Judge Barbuto called you into his office. That he gave you the name[s] of those five prostitutes and he said, "Talk to these women because they're talking some trash about me." And that when the cops picked you up, Bobie, they had that list of the five women. Isn't that true, Bobie? Aren't you Judge Barbuto's hitman?

With respect to this claim the district court held that because the videotape segment was "true"—an accurate depiction of the actual events—it could not form the basis for a libel claim. The court went on to state:

> There is no basis in the law of slander or libel, which is the gravamen on the sole remaining count of the complaint, for plaintiff's assertion that he was defamed by footage showing his attempt to flee Rivera. The footage is not defamatory because it is "true." To the extent that plaintiff's actions speak for themselves, it is not an utterance of the defendants and its showing is not libelous. Summary judgment for defendants is granted on this issue.

Since it has been previously determined that Brooks failed to establish the prima facie case for defamation—by a proper showing of the defendants' negligence—this claim likewise fails. It need not be addressed. Moreover, *Clark* and *Morrell* are easily distinguishable. In both these cases, the courts held that a showing of at least negligence or actual malice on the part of the defendant, by the plaintiff, was a prerequisite to recovery. Brooks's final assignment of error therefore fails.

### VI.

We thus **AFFIRM** the judgment of the district court.