**Birgit G. HEIN, Plaintiff,**

v.

**MERCK & CO., INC., Defendant.**

**No. 3–93–0541.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Nov. 22, 1994.

Gustavus Adolphus Wood, III, Jim Omer & Associates, Nashville, TN, for plaintiff.

Gary A. Brewer, Parks T. Chastain, Brewer, Krause & Brooks, Nashville, TN, for defendant.

## MEMORANDUM

WISEMAN, District Judge.

Before the court is a motion in limine to exclude the testimony of Richard A. Palfin, Ph.D., of Legal Economic Evaluations, Inc., who proposes to testify as to the "hedonic damages" suffered by the plaintiff in this tort case. The case is here on diversity of citizenship jurisdiction, and Tennessee law will govern as to substantive matters. As to this question, however, the Federal Rules of Evidence will apply.[1] The recent United States

---

1. Fed.R.Evid. 101; *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Brooks v. American Broadcasting Companies, Inc.,* 999 F.2d 167, 173 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114

S.Ct. 609, 126 L.Ed.2d 574 (1993); *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 825 n. 9. (D.C.Cir.1988); *Eli Lilly and Co. v. Home Insurance Co.,* 794 F.2d 710, 715 (D.C.Cir.1986); *see also* Charles A. Wright, Arthur R. Miller and

Supreme Court opinion in *Daubert v. Merrell Dow Chemical Co.*[2] has particular bearing on the question before the court.

■ In *Daubert*, this court is instructed to be a gatekeeper and to make an initial determination whether proffered "expert" testimony is helpful to the trier of fact, whether it is reliable, and whether it is valid.[3] If not, it must be excluded. The majority of the court went on to offer some "observations" of some of the "many factors [which] will bear on the inquiry."[4] The Court suggested: (1) has it been or can it be tested? (2) has it been subjected to peer review? (3) what is the potential rate of error? (4) how much acceptance does it have within the relevant scientific community?[5]

To these this court would add: (5) Are the underlying data untrustworthy for hearsay or other reasons? (6) Does the underlying data exclude other causes to a reasonable confidence level? (7) What do the leading professional societies say about this specialty or this type of testimony? (8) How much of the technique is based on the subjective analysis or interpretation of the alleged "expert?" (9) The judge's experience and common sense.

■ The plaintiff has submitted a report of Dr. Palfin in which he sets out the proffered testimony for purposes of this motion in limine. It reads, in pertinent part, as follows:

> The economics of valuing the enjoyment of life is [sic.] actually quite simple. Everyday, consumers increase or decrease their probabilities of dying when they buy certain products with better safety features in favor of less safe products. Workers also increase their chances of dying when they accept employment in high risk industries. Typically, high risk industries pay higher wages: low safety products cost less. These people are trading cash now for a higher chance of losing the pleasures of

living (dying). Implicitly, they are placing a value on the enjoyment of life.

> Economists first measure how much people in society are willing to pay (or willing to forego) to reduce their chances of dying from, say, 3 in 10,000 to 2 in 10,000. For example, if people are willing to pay $300 for a 1 in 10,000 reduction in their probability of dying, then by extension the implicit value of the pleasures of human life is $3,000,000. In other words, if 1/10,000th of a life is worth $300, then the whole life is worth 10,000 times $300 or $3,000,000.

> This is not to say that a person would willingly exchange his or her life for $3,000,000. Few people would make such a trade. In the course of everyday life, people must balance increased risks of dying against increased income, higher cost goods or the inconvenience of fastening a seat belt. Implicit within this balancing of risks and benefits is a value of human life. The value of the enjoyment of life represents the balancing point people in our society use to assess whether a given risk is worth the extra income or benefits.

> There are primarily three different techniques economists use to measure the dollar amount people are willing to pay (or accept) to change their probability of dying: 1) Wage studies comparing wages and risks in different jobs, 2) Consumer purchasing patterns for safety related items, and 3) Surveys asking people about their willingness to accept risk.

> Wage studies focus on the premium workers demand for engaging in high risk occupations. Coal miners are paid more than shipping clerks. This is in part because miners could easily be killed or injured on the job. The studies are unanimous on the point that high risk occupations pay higher wages.

> Consumer purchasing patterns can also be examined to quantify dollars spent relative to increased safety. These studies have looked at items like smoke alarms, seat

---

Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction,* § 4512 (1982).

**2.** 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**3.** *Id.* at ——, ——, 113 S.Ct. at 2795, 2800.

**4.** *Id.* at ——, 113 S.Ct. at 2796.

**5.** *Id.* at —— – ——, 113 S.Ct. at 2796–97.

belts, and larger (presumably safer) cars. For example when consumer smoke alarms were first introduced, they were expensive. Over the next few years, they dropped considerably in price. As one would expect, more smoke alarms were sold as they became less expensive. By comparing the increased sales of smoke alarms per dollar decrease in price to the risk of death in a fire, economists could calculate a dollar value for a reduction in the probability of dying.

Surveys (often referred to as "contingent valuation studies") can also be used to establish the trade-off people make between money and risk of death. These surveys pose hypothetical situations in which respondents are asked how much they would be willing to pay to avoid certain risks. For example, people might be asked how much they would be willing to pay to reduce their chances of dying in an auto accident.

This current economic research suggests a momentary value of the lost enjoyment of life at a minimum of $2,079,377, a midpoint of $3,119,065 and a maximum of $4,158,753. It is my opinion that Ms. Hein's loss of enjoyment of life is reasonably similar to the people who participated in these studies. I therefore conclude that the above figures represent a reasonable estimate of the value of the total enjoyment of living in Ms. Hein's case.

Because Ms. Hein is still alive, she has not lost 100% of the enjoyment of living. The jury will determine the percent reduction in enjoyment of living based on medical, psychological, and other testimony. Having determined the percentage of lost enjoyment of living, the jury may then apply that percentage to the economic research. For example, if it is determine that there

is a 25% reduction in the enjoyment of living, then this element of loss could reasonably be estimated as 25% of $3,119,065 or $779,766. Should the jury find 15% or 50% loss of enjoyment of living, damages should be similarly calculated.[6]

## THE DAUBERT FACTORS

The court now applies the *Daubert* suggested factors to the proffered testimony. First, the court must determine whether Dr. Palfin's theories have been or can be tested. Many of the predictions or assumptions of economists in damages testimony can be validated in retrospect, if not otherwise. For instance, predicted rates of inflation, predicted salary escalations, average life expectancies, average work life expectancies, average interest rates can all be looked at years down the line to determine if we were correct in allowing expert estimates of economic loss.[7] Such an evaluation after time has passed is a comforting response to the criticism that courts' decisions to accept or exclude novel scientific evidence may be "behind the curve," or may have a dampening effect on scientific development. No such retrospective validation is possible in Dr. Palfin's thesis of the valuation of hedonic damages. Speculative assumptions remain speculation.[8]

The next factors that *Daubert* suggests should be considered are whether the expert's proffered testimony has been subjected to peer review, and how much acceptance it enjoys within the relevant scientific community. The thesis that policy analysts should value a human life based on what an individual would pay for the reduced probability of dying was advanced in 1968 by Thomas Schelling.[9] It has been debated within the discipline since that time. One writer suggests that it has been generally accepted as sufficient to meet the test of

**6.** Exhibit A to Defendant's Motion to Exclude the Testimony of Dr. Richard A. Palfin on the Issue of Hedonic Damages, November 1, 1994.

**7.** *See* Judge Zagel's interesting discussion of validation in *Mercado v. Ahmed,* 756 F.Supp. 1097, 1099 (N.D.Ill.1991), *aff'd,* 974 F.2d 863 (7th Cir. 1992).

**8.** *See* Parker Cashdollar and Marsha Cope Hute, *Reliability and Validity of Hedonic Damage Testi-*

*mony: Judicial Logic about Economic Science in Merrell Dow and Mercado,* 3–DEC J. Legal Econ. 57, 67 (1993).

**9.** Ted. R. Miller, *Public Policy: Willingness to Pay Comes of Age: Will the System Survive?,* 83 Nw.U.L.Rev. 876, 878 n. 13 (1989), *citing,* Thomas Schelling, *The Life You Save May Be Your Own,* in Problems in Public Expenditure Analysis 127 (S. Chase ed. 1968).

*Frye v. United States*[10,11] A more recent examination of the literature in light of *Daubert* suggests a less universal acceptance:

> A comparison of the levels of reliability and validity between (1) lost earnings evidence and (2) hedonic damage estimates, however, points out the difficulty of general acceptance of hedonic estimates under these standards of comparison. The variance among estimates of hedonic damage is a genuine problem in their acceptance as related to reliability. But the variance is not so great a problem as the disagreement among experts regarding the methodology. As long as experts disagree strongly about what is being measured, and how to measure it, reliability should be adjudged insufficient to meet the judicial standard for admissibility.[12]

Judge Zagel, in *Mercado v. Ahmed*, opined: "[h]owever, there is no basic agreement among economists as to what elements ought to go into the life valuation. There is no unanimity on which studies ought to be considered. There is a lack of reliability."[13]

Dr. Palfin bases his valuation of the loss in this case as in any other case on "anonymous lives." Such a generic view may be appropriate for a governmental agency's cost-benefit analysis of a proposed regulation, for instance. However, it seems a rather callous and unhelpful perspective when the issue before the factfinder is the loss of enjoyment of life of a particular individual. It seems obvious to this Court that some people enjoy life more than others. Attitudes, tastes, and psychological makeup, among many other possible factors, would affect one's hedonic potential. Such consideration in gross has been widely and justifiably criticized in the literature.[14]

According to the *Daubert* opinion, the next important question that the court should raise concerns the potential rate of error. Here is where the studies are most vulnerable to criticism of their reliability. Values for an anonymous life have varied in these studies from $100,000[15] to $12,000,000.[16] A spread of this magnitude not only admits the possibility of error, it casts serious doubt on the validity and usefulness of the exercise.

There are also critical errors in the assumptions and methodology of the three models used to arrive at hedonic valuation. The "willingness to accept" model postulates that individuals are willing to accept higher amounts of money in return for higher risks of death. An extrapolation is then made from the differential between salaries for low-risk jobs and high-risk jobs to come up

**10.** 293 F. 1013 (D.C.Cir.1923).

**11.** Miller, *supra* note 9, at 879 n. 18. The *Frye* test was the majority rule in this country before *Daubert*, which held that Fed.R.Evid. Rule 702 trumped the *Frye* test in Federal court litigation. —— U.S. at ——, 113 S.Ct. at 2793. *Frye* is still the rule in many states. In *Frye*, the court held that the admissibility of scientific evidence depends upon whether it is sufficiently established to have gained general acceptance in the particular field in which it belongs. 293 F. 1013. *Daubert* holds that this is still a factor to be considered, but is not the controlling factor that *Frye* held it to be. —— U.S. at ——, ——, 113 S.Ct. at 2793, 2797.

**12.** *Supra*, note 8, at 70.

**13.** 756 F.Supp. at 1103.

**14.** *See, e.g.*, Erin A. O'Hara, Comment, *Hedonic Damages for Wrongful Death: Are Tortfeasors Getting Away With Murder?*, 78 Geo.L.J. 1687, 1689 n. 8 (1990), *citing* C. Gillette & T. Hopkins, *Federal Agency Valuations of Human Life: Report to the Administrative Conference of the United States* (1988). *See also:* Miller, *supra* note 9, at 883 n. 36, *citing: The Price of Health* (G. Agich & C. Begley eds. 1986); M. Thompson, *Benefit–Cost Analysis for Program Evaluation* (1980).

**15.** *See* Miller, *supra* note 9 at 878 n. 14, *citing*, J. Acton, *Evaluating Public Programs to Save Lives; the Case of Heart Attacks* 68 (Rand Corp. Series No. R–950–RC, 1973).

**16.** *See* Miller, *supra* note 9, at 882 n. 29, *citing*, Kahn, *Economists' Evaluation of the Value of Life*, Presentation at the Third National Conference on Engineering Ethics, Engineering Safety: The Value Dimensions of Controlling Hazardous Technology (May 1985). *See also:* Tina M. Tabucci, *Hedonic Damages: A New Trend in Compensation?*, 52 Ohio St.L.J. 331, 338 n. 49 (1991), *citing*, Darnell, *Hedonic Value: Economists Put Price on a Life*, Nat'l L.J., Oct. 16, 1989, at 15 (value range between $1,600,000 and $8,000,-000); Glenn Blomquist, *The Value of Human Life: an Empirical Study*, 19 Economic Inquiry 157, 158 (1981) (value range between $50,000 and $8,900,000).

with the hedonic value of life.[17] The dubious assumptions upon which this model rests are that workers are faced with a free choice of jobs, in the first place, and then that they exercise that choice with full information about the risks involved, and do so because of the wage premium.[18]

The "willingness to pay" model is based upon consumption activities of individuals. From the price differential between a safer product and one less safe, and the reduction of risk of dying supposedly consequent therefrom, an extrapolation is made to arrive at the hedonic value of life.[19] Here again, the underlying assumptions are that people have complete freedom of choice in such decisions and that they perceive the risks accurately. Both are subject to serious question. Additionally, as one critic points out, it does not comport with reality:

> The truth is that we often fail to avoid risks even when they involve little cost. This is probably because we believe in our own immortality, sharing a kind of "that only happens to other people" mentality. Presumably, most drivers know that the failure to wear a seatbelt substantially increases their chances of dying in a serious auto accident, yet most drivers still do not wear seatbelts. Does their failure to accept a small inconvenience to avoid a significant risk of death mean that people to not value their lives highly, or does it mean only that, regardless of the existence of the risk, they do not think it will happen to them? [20]

No attempt at regression analysis is made, if such were possible, to eliminate the impact of government regulation and threat of criminal sanction (as in seat belts or air bags), insurance premium reduction (as in smoke alarms), advertising, and other competitive advantages that may influence consumer choices. The third model referenced by Dr. Palfin and used by others in the field is the survey model. In this method, individuals are asked to state what they would be willing to pay to reduce their chance of dying by a specified percentage.[21] Of course, very few people have this kind of money. If reversed to ask the amount they would be willing to accept to voluntarily depart this life, or to play Russian roulette, the questionnaire becomes a game. This method is perhaps the most ridiculous. Even at my somewhat advanced age, I'm not ready or willing to put a price on my continued existence. Honest answers to hypothetical questions of this kind are not possible. This methodology is subject to criticism for being based on unreliable, untrustworthy hearsay. It fails the "common sense" test, as well.

To answer *Daubert*'s question about the inherent rate of error in the methodology, the proffered testimony appears to be more probably not true than true.

## THE JUDGMENT OF OTHER COURTS

The first case to admit expert testimony on hedonic damages appears to be *Sherrod v. Berry*, first affirmed by the Seventh Circuit, and then vacated and remanded on other grounds.[22] Since then, Judge Zagel decided

---

17. For example, if there is a 1 in 10,000 chance of accidental death in a coal mine, and coal miners make $1000 more per year than a low-risk job in the same area, this converts to a hedonic value of life of $10,000,000. 1000/.0001 = $10,000,000.

18. *See:* Andrew Jay McClurg, *It's a Wonderful Life: The Case for Hedonic Damages in Wrongful Death Cases*, 66 Notre Dame L.Rev. 57, 105 (1990).

19. *See* the proffer of Dr. Palfin, *supra* note 5, and accompanying text. "For example, if people are willing to pay $300 for a 1 in 10,000 reduction in their probability of dying, then by extension the implicit value of the pleasures of human life is $3,000,000." *Id.*

20. McClurg, *supra* note 18, at 105.

21. *See:* Dr. Palfin's proffered testimony, *supra* note 5, and accompanying text. "These surveys pose hypothetical situations in which respondents are asked how much they would be willing to pay to avoid certain risks. For example, people might be asked how much they would be willing to pay to reduce their chances of dying in an auto accident." *Id.*

22. 629 F.Supp. 159 (N.D.Ill.1985), *aff'd*, 827 F.2d 195 (7th Cir.1987), *vacated and remanded on other grounds*, 835 F.2d 1222 (7th Cir.1988).

*Mercado v. Ahmed,*[23] in which he refused to follow *Sherrod* and excluded the proffered testimony of the same witness as in *Sherrod,* on grounds of lack of reliability and validity. The Seventh Circuit Court of Appeals affirmed Judge Zagel's decision.[24] The same type of testimony from the same expert Smith was again rejected in the Northern District of Illinois in *Doe v. Tag, Inc.*[25] The same testimony by the same expert was again rejected by the District of Kansas in *Sullivan v. U.S. Gypsum Co.*[26] There Judge Lungstrum held that the hedonic testimony of Smith (essentially the same as that proffered by Palfin) was scientifically invalid and would not assist the trier of fact. There will be other cases, as it appears that this type of testimony is the fashionable trend among claimant's attorneys.

### CONCLUSION

In conclusion, it is the opinion of this court that expert testimony of valuation of "hedonic" damages is unreliable and invalid under the teaching of *Daubert.* It is not helpful to the jury. The motion in limine is granted.

### *ORDER*

For the reasons stated in the memorandum of law filed contemporaneously herewith, the motion in limine of the Defendant to exclude the testimony of Dr. Richard A. Palfin is hereby granted. Defendant's motion in limine to exclude evidence of the financial situation of the Defendant is also granted.

IT IS SO ORDERED.

**23.** 756 F.Supp. 1097 (N.D.Ill.1991), *aff'd,* 974 F.2d 863 (7th Cir.1992).

**24.** 974 F.2d 863 (7th Cir.1992).

**25.** No. 92–C–7661, 1993 WL 484212 (N.D.Ill. Nov. 18, 1993).

**26.** 862 F.Supp. 317 (D.Kan.1994).