WILLIAM J. SCHMIDT, APPELLANT, V. OMAHA PUBLIC POWER
DISTRICT AND NEBRASKA UNDERGROUND HOTLINE, INC., ALSO
KNOWN AS ONE CALL, APPELLEES.

515 N.W.2d 756

Filed May 6, 1994.    Nos. S-92-264, S-92-541.

Warren C. Schrempp and Lee R. Terry, of Schrempp and Terry, for appellant.

Michael F. Coyle and Leslie E. Kendrick, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee Omaha Public Power District.

Eugene P. Welch and Alison T. Lonsdale, of Gross & Welch, P.C., for appellee Nebraska Underground Hotline.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

FAHRNBRUCH, J.

William J. Schmidt appeals from two separate orders of the district court for Douglas County sustaining the summary judgment motions of Omaha Public Power District (OPPD), case No. S-92-264, and Nebraska Underground Hotline, Inc. (Hotline), case No. S-92-541.

Although Schmidt filed but one lawsuit against OPPD and Hotline as codefendants, the granting of summary judgment as to each defendant at different times has resulted in two separate appeals to this court. Because the facts and issues in each appeal are somewhat interrelated, we elect to consider the two appeals in a single opinion in the interest of judicial economy.

We reverse the district court's orders of summary judgment and remand the causes as to OPPD and Hotline for further proceedings in the district court.

## I. FACTS

Schmidt, an employee of Bonn Fence Company (Bonn Fence), suffered electrical shock injuries on May 28, 1988, when he struck an electric powerline with an auger while digging post holes for his employer. Bonn Fence had been hired to build a beer garden, including a perimeter fence, adjacent to

an Omaha bar. Bonn Fence is a corporation whose president is Bo Bonn.

Bo Bonn testified in his deposition that prior to any digging, Bonn Fence always calls Hotline to obtain the location of any buried cables or other buried utilities. Bonn Fence was following that procedure in May 1988.

Randall Parker, president of Hotline, testified by deposition that the predecessor to Hotline, previously known as One Call, was formed in Omaha in the early 1970's by various utility companies, including OPPD. One Call was originally developed as a way for contractors to have underground utilities located, thereby preventing damage to utilities' underground equipment, without having to call each individual utility.

Parker described Hotline as it now exists as a "distribution service" which takes location information from a caller planning to dig and then determines by computer which member utilities have requested notification of excavation in that particular location. Parker further testified that after Hotline transmits the location information to member utilities requesting coverage for the location, dispatch personnel from each utility notify Hotline of the time when locators will be at the subject property. According to Parker, Hotline relays this information to the caller, and at that point, Hotline's role in the process is finished.

On May 24, someone from Bonn Fence contacted Hotline and requested a "locate" at the bar property. OPPD was scheduled to locate its lines at 8 a.m. the following day. The evidence is in conflict as to whether Bonn Fence agreed to have someone from the company meet with the OPPD locator. An OPPD locator testified in his deposition that he arrived at the worksite before 8 a.m. and that he left 15 minutes later without marking anything when no one from Bonn Fence appeared.

Brad Bonn, a brother of Bo Bonn and an employee of Bonn Fence, testified in his deposition that he called Hotline on May 25 and requested an additional locate because nothing had been marked. Brad Bonn further testified that when he called, a woman at Hotline told him that all powerlines were to the east and front or south of the building and that the area was clear of

powerlines to the back and west.

Parker testified that Hotline records and tapes its conversations with callers. A transcribed copy of conversations between Hotline and Bonn Fence was entered into evidence, accompanied by Parker's affidavit stating that it included "every conversation that exists between employees of [Hotline] and Bonn Fence personnel" and was an "accurate [reproduction] of the tape recorded conversations had between the parties." The transcribed conversations contain no statement by Hotline personnel as to the location of powerlines.

The OPPD locator thought he returned to the bar property on May 26, and again there was no one from Bonn Fence present. Because the second locate was scheduled for "any time," the locator marked OPPD's equipment and left. This consisted of marking OPPD's primary cable, which ran along the east side of the property from a transformer on the northeast corner of the property to a switch near the street at the southeast corner of the property.

On May 28, Schmidt, after being told by Bo Bonn that it was safe to dig in the area, began digging post holes on the north side of the building. Schmidt, operating a Bobcat tractor with an auger attachment, dug six holes. While digging the seventh hole, Schmidt struck a buried underground electric line and sustained a severe electrical shock. Schmidt claims that OPPD failed to shut off the electricity until Bo Bonn called a second time. Schmidt said that during the interval, he continued to receive electrical shock.

Schmidt sued, naming OPPD and Hotline as codefendants. He alleged negligence on the part of OPPD in the following respects: (1) failing to mark the buried electric line on the north side of the bar property; (2) representing that all lines had been properly marked, when such representation was false; (3) failing to warn of the existence of buried electric line on the north side of the property; (4) failing to timely turn off the electricity after Schmidt's contact with the electric line, causing a more severe injury; (5) failing to properly and timely communicate to Schmidt or his employer any policy concerning locating or not locating secondary buried electric lines; and (6) failing to inform defendant Hotline of any policy concerning

locating or not locating secondary buried electric lines on commercial property.

OPPD denied negligence because the underground electric line struck by Schmidt was not owned or controlled by OPPD. It therefore had no duty to Schmidt, argues OPPD. It is undisputed that the line Schmidt struck was a secondary line running from a transformer on the bar property to a business north of the bar and that the line was not owned by OPPD. A primary line is a high-voltage line which runs from a substation to a transformer. A secondary line is one which carries electricity from the transformer to a meter after the transformer has reduced the voltage.

An OPPD vice president testified by deposition that it is not OPPD's practice to locate secondary lines in a commercial setting unless those lines are owned by OPPD. He did not know of any written policy for OPPD's locators to follow, nor did he know whether the practice of locating only OPPD-owned equipment was communicated to customers in any way. An OPPD manager testified in his deposition that a contractor working on commercial property must ordinarily contact the property owner to have secondary lines marked.

OPPD maintains that it could not have made any representation of material fact to Bonn Fence or Schmidt, because OPPD never had any communication with either. OPPD also denies that it failed to timely shut off the electricity once Schmidt hit the secondary line. It submitted an affidavit stating that the fuses in the transformer cleared within .14 to .18 second after the dig-in, automatically deenergizing the line.

Finally, OPPD alleged that Schmidt assumed the risk of digging when he had knowledge that underground electric cables were in the immediate vicinity and that Schmidt was contributorily negligent in digging prior to ascertaining whether it was safe to do so.

Schmidt alleged that Hotline was negligent in (1) failing in its duty to inquire, request, or research whether or not OPPD locates all buried electric powerlines on commercial property; (2) failing to warn those who use its services that OPPD may not locate all buried electric powerlines; and (3) representing to Schmidt that all buried electric cables could be located, when

such representation was false.

Hotline maintains that it is not in the business of locating underground cables and had no duty to Schmidt because it did not own, possess, or control the property on which he was injured. Hotline disputes Schmidt's assertion that one of Hotline's employees assured Brad Bonn that all power was to the south and east of the building. Hotline entered into evidence transcripts of its conversations with Bonn Fence, which do not reflect that such a statement was made. Hotline further argues that even if such a statement had been made, there is no evidence that Hotline knew the statement to be false or made the statement with reckless disregard for the truth.

Hotline alleged that Schmidt was contributorily negligent by failing to ascertain the location of the underground cable which he struck with an auger, when he knew or should have known that the cable had not been marked by OPPD.

OPPD was granted summary judgment on Schmidt's fifth amended petition, the operative petition before the court at that time. On March 6, 1992, the trial court, after entering summary judgment in favor of OPPD, dismissed Schmidt's fifth amended petition with prejudice as to OPPD only. Schmidt appealed the trial court's summary judgment in favor of OPPD.

Schmidt filed a sixth amended petition on March 24, which Hotline answered on April 16. Hotline moved for summary judgment on May 29. The trial court granted Hotline's summary judgment motion on June 18.

In each case, the court specifically found that there was no basis or foundation for the opinion of Schmidt's expert witness, Dr. Bruce Johnson, and struck Johnson's opinion as a matter of law. Appeals of the trial court's summary judgment in favor of each of the defendants were timely filed.

## II. ASSIGNMENTS OF ERROR

On appeal, Schmidt claims that the district court erred in (1) sustaining OPPD's motion for summary judgment when Schmidt offered evidence of material facts supporting genuine issues of law including misrepresentation, failure to warn, and failure to timely react; (2) sustaining Hotline's motion for summary judgment when Schmidt offered evidence of material

facts supporting genuine issues of law including misrepresentation and failure to warn; and, as to each defendant, (3) excluding the testimony of Dr. Bruce Johnson, Schmidt's expert witness.

### III. STANDARD OF REVIEW

In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Hawkins Constr. Co. v. Reiman Corp., ante* p. 131, 511 N.W.2d 113 (1994). Summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

### IV. ANALYSIS

#### 1. SUMMARY JUDGMENT FOR OPPD

Turning to the issue of whether the trial court properly granted summary judgment in favor of OPPD, we note that OPPD is a political subdivision as defined by Neb. Rev. Stat. § 13-903(1) (Reissue 1987). Therefore, any suit brought against OPPD must be brought pursuant to the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 et seq. (Reissues 1987 & 1991 & Cum. Supp. 1992).

Section 13-905 of the Political Subdivisions Tort Claims Act states in pertinent part: "All tort claims under [the Political Subdivisions Tort Claims Act] shall be filed with the clerk, secretary, or other official whose duty it is to maintain the official records of the political subdivision . . . ."

Schmidt, in his fifth amended petition, the operative petition before the court at the time of OPPD's summary judgment motion, alleged that "O.P.P.D. [had] received valid and sufficient notice of claim under Nebraska Governmental Tort Claims Act, said claim was withdrawn on February 14, 1989, the letter of withdrawl [sic] is marked Exhibit A, attached hereto and incorporated herein as if fully set out."

In its answer to Schmidt's fifth amended petition, OPPD

"specifically [denied] that Plaintiff has complied with the provisions of the Nebraska Political Subdivision's [sic] Tort Claim [sic] Act and [put] Plaintiff on strict proof of same." In his reply, Schmidt made only a general denial of "each and every allegation in defendants' answer except those allegations which constitute an admission against the defendants."

Compliance with the filing or presentment of claim provision in § 13-905 is a condition precedent to commencement of a negligence action against a political subdivision. *Millman v. County of Butler*, 235 Neb. 915, 458 N.W.2d 207 (1990).

Because Schmidt has alleged that OPPD had received notice of his claim, and OPPD has specifically denied that Schmidt complied with the provisions of the Political Subdivisions Tort Claims Act, there exists a genuine issue of material fact as to whether Schmidt met a condition precedent to commencement of his negligence action against OPPD. Therefore, it was error for the trial court to enter summary judgment in favor of OPPD, and it is not necessary for us to further determine whether there are other genuine issues of material fact as to OPPD's liability.

### 2. SUMMARY JUDGMENT FOR HOTLINE

Schmidt argues that Hotline was not entitled to summary judgment because it (1) negligently failed to properly investigate whether OPPD locates all powerlines, (2) negligently failed to warn Schmidt that all powerlines would not be located, and (3) negligently misrepresented the location of powerlines on the worksite.

The issues raised by Schmidt are questions of first impression in Nebraska. Our research has found no law in this jurisdiction, nor in any other for that matter, on the liability of a one-call clearinghouse such as Hotline to a caller who requests that underground utilities be located prior to excavating in a particular area. We therefore look to the general principles of pleading and negligence law for guidance.

### (a) Negligent Misrepresentation

We first turn to Schmidt's argument that Hotline negligently misrepresented that the only electric powerlines on the construction site were located to the east and south of the

property, when in fact there was a secondary line to the north of the bar. This argument is inconsistent with Schmidt's sixth amended pleading, which alleged in part:

> 6. That on May 24 and May 25, 1988, *O.P.P.D. represented* to Bonn Fence Company that all electric lines had been marked and that all electric lines were east of the building.
>
> 7. That Bonn Fence Company and its employees relied on Nebraska Underground Hotline, Inc.'s representation that all underground electric lines would be located. That Bonn Fence Company and its employees relied on *O.P.P.D.'s representation* that all buried electric lines had been marked and all electric lines were east of the building.
>
> . . . .
>
> 11. That the defendant, Nebraska Underground Hotline, Inc. by and through its agents and employees, was negligent in the following particulars:
>
> . . . .
>
> (c) In representing to plaintiff that all buried electric cables could be located when said representation was false.

(Emphasis supplied.)

Thus, the factual issues as to negligent misrepresentation raised by Schmidt's pleadings are (1) whether OPPD represented to Bonn Fence that all powerlines were located to the east of the building and (2) whether Hotline represented to Bonn Fence and its employees that all underground electric lines could or would be located.

As to the first issue, we note that nowhere in his pleadings does Schmidt allege that *Hotline* represented to him that all powerlines were located to the east of the building. His only factual allegation is that OPPD did so. The issues of a case are framed by the pleadings, see *Christianson v. Educational Serv. Unit No. 16*, 243 Neb. 553, 501 N.W.2d 281 (1993), and Schmidt cannot now argue that Hotline negligently misrepresented the location of the underground electric lines after failing to so plead.

Next, we determine whether there is any evidence that Hotline represented to Bonn Fence or to Schmidt that all

underground electric lines either could or would be located.

Bo Bonn testified in his deposition that his *understanding* was that when he would call Hotline, OPPD would come out and mark all powerlines within the work area. He based this conclusion on past experience, i.e., that OPPD had located and marked all lines in the past.

Brad Bonn had talked to Hotline regarding the locate at the bar worksite. He testified in his deposition that no one from Hotline ever stated to him that all buried electric cables would be marked.

Schmidt himself testified that his *understanding* was that all the powerlines had been marked. He testified that Bo Bonn had told him this, but he did not remember the specific conversation.

Hotline, in its answer to Schmidt's sixth amended petition, specifically denied that it made any representation to Bonn Fence and/or its employees that all underground electric lines would be located. In support of its motion for summary judgment, Hotline entered into evidence a transcribed copy of tape recordings of all conversations between Hotline and Bonn Fence personnel relative to the locates at the bar worksite. The transcript of those conversations contains no representation by Hotline that all electric lines could or would be located.

There exists no genuine issue of material fact as to whether Hotline represented to Schmidt that all electric lines could or would be located. Schmidt has offered no evidence that Hotline made such a representation, and any subjective understanding by Schmidt or other Bonn Fence employees is insufficient to create a fact issue as to whether such a representation was made. Therefore, Schmidt cannot prevail on a theory of negligent misrepresentation.

### (b) Failure to Warn

Turning now to Schmidt's first two arguments, it is clear that any duty of Hotline to inquire whether OPPD located all powerlines is subsumed in any duty of Hotline to warn Schmidt that all powerlines would not be located. Stated another way, if Hotline had no duty to warn Schmidt, it would be pointless for the law to impose a duty on Hotline to acquire such knowledge

in the first place. We limit our analysis to whether Hotline negligently failed to warn Schmidt that not all electric lines would be located by OPPD.

For actionable negligence to exist, there must be a legal duty on the part of the defendant to protect the plaintiff from injury, a failure to discharge that duty, and damage proximately resulting from such undischarged duty. *First Nat. Bank of Omaha v. State*, 230 Neb. 259, 430 N.W.2d 893 (1988). Therefore, for Hotline to be liable to Schmidt, there first must be a legal duty running from Hotline to Schmidt.

> "[D]uty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. . . .
>
> A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53 at 356 (5th ed. 1984). Accord *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987).

"Foreseeability is a factor in establishing a defendant's duty, or, as expressed by Justice Cardozo in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 394, 111 N.E. 1050, 1054 (1916): '[F]oresight of the consequences involves the creation of a duty . . . .' " *Holden v. Urban*, 224 Neb. 472, 475, 398 N.W.2d 699, 701 (1987). Again quoting Justice Cardozo, in what is undoubtedly his most famous opinion: "The risk reasonably to be perceived defines the duty to be obeyed . . . ." *Palsgraf v. Long Island R. R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928).

Under the facts of this case, the risk of serious harm to Schmidt was foreseeable by Hotline. It is common knowledge that electricity is a dangerous commodity, and it requires little imagination to perceive the risk of electric shock to an individual who digs in an area containing hidden underground electric lines. It is entirely foreseeable that a caller to Hotline, having requested a locate of electric lines and having observed

power company markings on the ground, would proceed to excavate in the belief that all electric lines had been marked.

It is also foreseeable that such a caller, having thus proceeded, could be seriously injured or killed by electric shock upon striking an electric line which has not been marked because it is not owned by the power company. The foreseeability and magnitude of this risk militates in favor of imposing a duty upon Hotline to inquire and to warn callers that not all electric lines are marked by the power company.

The imposition of a duty may also be grounded in public policy considerations. "The policy characteristic of duty is one method that courts use to allocate the costs of injury in a manner that considers the interests of both society and the injured person." 4F Personal Injury § 1.01[2][i] at 78 (Louis R. Frumer et al., eds., 1989).

The case *Hopkins v. Fox & Lazo Realtors*, 132 N.J. 426, 625 A.2d 1110 (1993), is in many ways analogous to the case at hand and offers guidance on whether liability may be imposed upon Hotline for failure to warn Schmidt that OPPD did not mark all underground electric lines. In *Hopkins*, potential home buyers and their relative were touring an open house at the invitation of a real estate broker. The relative fell and broke her ankle while proceeding from one level of the home to another and sued the real estate broker for failing to warn her of the danger. She claimed that the connecting step was "camouflaged" because a similar vinyl flooring covered both areas. The trial court granted summary judgment in favor of the real estate broker.

On appeal, the New Jersey Supreme Court addressed the issue of whether a real estate broker who holds an open house for the purpose of attracting potential buyers has a duty of care with respect to the safety of those touring the home, including a duty to warn of potential dangers in the home. In imposing a duty of care upon the real estate broker, the court looked to the principles of public policy and the perceptions of social values underlying the common law. The court stated:

> The actual imposition of a duty of care and the formulation of standards defining such a duty derive from considerations of public policy and fairness. [Citation

omitted.] "This Court has carefully refrained from treating questions of duty in a conclusory fashion, recognizing that '[w]hether a duty exists is ultimately a question of fairness.' " [Citations omitted.]

Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. [Citation omitted.] That inquiry involves identifying, weighing, and balancing several factors—*the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.*

(Emphasis supplied.) 132 N.J. at 439, 625 A.2d at 1116.

In analyzing the above four factors, the New Jersey Supreme Court first noted that while a real estate broker acts as the homeowner's agent, the broker also receives tangible benefits from the relationship with any potential buyers who attend an open house. An open house enables the broker to sell the property and earn a commission, as well as to cultivate future clients. The court concluded that the relationship between a real estate broker and a customer in an open house inspection of property is substantial and that "implicit in the broker's invitation to customers is some commensurate degree of responsibility for their safety while visiting the premises." 132 N.J. at 441, 625 A.2d at 1117.

The court analyzed the nature of the attendant risk in terms of foreseeability and found it to be highly foreseeable that open house visitors wandering through an unfamiliar house could be injured by dangerous conditions.

As to the opportunity and ability to exercise care, the court noted that the reasonableness of precautions is dependent upon the practicability of preventing the harm. The court concluded that a broker is under a duty to conduct a reasonable broker's inspection consistent with the customary standards of real estate brokers conducting open house tours, contingent upon whether it is reasonable for a broker to inspect the premises and whether the broker has an adequate opportunity to do so in preparation for the open house. The court observed that real

estate agents derive economic benefits from an open house and that real estate agents should therefore be able to bear the cost of accident prevention.

Finally, the court concluded that the public interest was served by recognizing a duty of care on the part of brokers. The court reasoned that tort law is designed not only to provide legal redress to injured parties, but also to discourage tortious behavior by creating incentives to minimize the risks of harm, thus preventing accidents. However, in remanding the cause for trial, the court emphasized that although it had found the existence of a duty to the plaintiff, it was for the trier of fact to determine whether the real estate broker had breached that duty.

The New Jersey Supreme Court's analysis in *Hopkins* provides a useful framework for our analysis of this case. The relationship between the parties in this case is closely analogous to that of the parties in *Hopkins*. Hotline, as a service to its member utilities, invites those who are planning to dig or excavate to call the Hotline number for the location of buried cables or utilities.

Hotline advertises its services in the white and yellow pages of the telephone directory, in mailings, and on calendars, hats, coolers, key chains, wallet cards, and other advertising items. The Hotline telephone number is also advertised by member utility companies on pedestal stickers. Some of the advertising is paid for by Hotline, and some is paid for by the member utilities.

There is no charge to the caller for Hotline's services. Hotline is paid by each of the member utilities on a contractual basis. For example, the contract between OPPD and Hotline in effect at the time of Schmidt's accident required OPPD to pay Hotline a minimum monthly fee for a predetermined number of calls at $2.20 per call, for a minimum charge of $32,285 annually. The contract also required OPPD to pay Hotline $1.70 for each call in excess of the minimum monthly number.

An annual charge of $32,285 is a substantial amount of money. It seems obvious that to the extent that excavators decline to use Hotline's services for whatever reason, member utilities will no longer be willing to pay for Hotline's services.

Therefore, although Hotline has no contractual relationship with its callers, Hotline's continued existence is dependent upon the continued use of its services by callers who are planning to excavate.

Additionally, Parker testified in his deposition that public safety is one purpose of Hotline. Implicit in Hotline's invitation to excavators to use its services is some commensurate degree of responsibility for the safety of its callers, and such responsibility is consistent with Hotline's stated purpose of public safety.

As to the nature of the attendant risk, we have previously discussed the grave risk which is posed to an excavator who is digging in an area containing unmarked underground electric lines, and have concluded that such a risk to its callers is readily foreseeable by Hotline.

We now turn to the third factor, whether Hotline had the opportunity and ability to exercise care. It is clear that Hotline has both the opportunity and the ability to exercise care toward its callers. This is because Hotline is the universal point of contact for all callers needing underground utilities marked. All that Hotline need do is advise callers that its member utilities locate only their own equipment, and warn the caller that there could be additional buried equipment which the excavator or property owner is responsible for locating. Such a warning is reasonable under the circumstances, practical, and extremely cost-effective. In fact, the cost to Hotline of such a warning, which would take only a few seconds, would be negligible.

Finally, the public interest would be well served by recognizing a duty of care on the part of an entity such as Hotline. The public certainly has a vital interest in preventing accidents from electrical shock. If Hotline is in the business of public safety, as well as property damage control, it should be encouraged to minimize such risks to the public.

We therefore hold that Hotline has a duty of care to its callers. This duty arises because of the integral relationship which Hotline has to its callers in the course of performing its contractual obligations to member utilities. Ordinarily, the scope of Hotline's duty is limited to the duty to inquire of its member utilities as to what equipment the utility actually

locates, and to warn callers that only underground equipment owned by the member utility will be located. This warning should include the caveat that OPPD does not ordinarily locate underground secondary electric lines on commercial property.

Although we find that Hotline has a duty to warn callers that electric lines not owned by OPPD are not located, we do not determine that Hotline had such a duty to Schmidt. The duty to warn others of a particular peril is not absolute; the need to warn depends upon, among other things, the age, intelligence, and information of those to whom the warning might be due, and the obligation disappears entirely where it is shown that the injured person did in fact know of and fully appreciate the peril. *Tiede v. Loup Power Dist.*, 226 Neb. 295, 411 N.W.2d 312 (1987).

According to the record, Schmidt often functioned in a supervisory capacity at Bonn Fence. He was second in command after Bo Bonn and was authorized to act for the company, including bidding jobs and running whole jobs from start to finish. He was able to do grading work and had used a Bobcat tractor to do this, as well as hand and power augers. Although most of Bonn Fence's work during Schmidt's employment with the company was residential, Schmidt estimated that about 15 to 20 percent was commercial in nature. Schmidt testified by deposition that in preparing to start on a job, it was necessary to decide whether underground lines of any type would be a factor. If so, Schmidt utilized Hotline's services to have such lines located.

Schmidt further testified that he had worked near a transformer on jobs prior to the job at the bar property. He was aware that electric lines were buried underground leading to and from such transformers. He was also aware that to get electric power from a power source to another area, the power has to come either from a fuse box or from a power source going into a fuse box. Schmidt was surrounded by a group of commercial buildings at the jobsite where he was injured. He knew that underground electrical cable could be going into the various businesses. He further knew that the powerlines could be in the air.

Schmidt had been doing excavation for a retaining wall at the

jobsite for 2 weeks prior to the incident in question. In his deposition, Schmidt testified that the only OPPD markings he observed in the time he spent on the jobsite were in an area close to the transformer, on the pavement north of the transformer which was located on the north edge of the jobsite, and on a hill to the west of the building. Schmidt had observed all these markings prior to the time of his accident.

Nevertheless, Schmidt proceeded to dig upon the assurance of Bo Bonn that all the underground powerlines had been located and marked. The foregoing facts are sufficient to create a question of fact as to whether Schmidt was sufficiently aware of the peril to relieve Hotline of its duty to warn him of the danger.

Moreover, Hotline has raised in its answer the issue of Schmidt's contributory negligence. Contributory negligence is conduct for which the plaintiff is responsible, amounting to a breach of the duty imposed upon persons to protect themselves from injury, and which, concurring with actionable negligence on the part of the defendant, is a proximate cause of injury. See, *Behm v. Northwestern Bell Tel. Co.*, 241 Neb. 838, 491 N.W.2d 334 (1992); *Grote v. Meyers Land & Cattle Co.*, 240 Neb. 959, 485 N.W.2d 748 (1992).

To constitute want of due care on the plaintiff's part, it is not necessary that he or she have anticipated the exact risk which occurred or that the peril was a deadly one; it is sufficient that the plaintiff knew or should have known that substantial injury was likely to result from his or her acts. *Engleman v. Nebraska Public Power Dist.*, 228 Neb. 788, 424 N.W.2d 596 (1988).

There is sufficient evidence to create a genuine issue of material fact as to whether Schmidt knew or should have known of the danger of digging and thus was contributorily negligent, as well as whether Hotline had a duty to warn Schmidt, and it was error for the trial court to enter summary judgment in favor of Hotline. We reverse the trial court's order of summary judgment as to Hotline and remand the cause for trial.

### 3. EXPERT TESTIMONY

In his final assignment of error as to both OPPD and

Hotline, Schmidt claims that the trial court erred in striking the testimony of his expert witness. Dr. Bruce Johnson, an electrical engineer, testified on Schmidt's behalf that in his opinion, OPPD had a duty to warn Schmidt of the presence of the secondary line, and that some lines were not located.

In Johnson's opinion, Hotline had a duty to inquire of OPPD whether the area would be safe to work and to warn Schmidt if the area would not be safe. The trial court, in ordering summary judgment in favor of both OPPD and Hotline, found that there was no basis or foundation for Johnson's opinion and ordered his opinion stricken as a matter of law.

The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993); *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 783, 496 N.W.2d 902 (1993). Expert testimony concerning a question of law is generally not admissible in evidence. *Kaiser v. Western R/C Flyers*, 239 Neb. 624, 477 N.W.2d 557 (1991). See, also, Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1989). "[E]xpert testimony is relevant and admissible only if it tends to help the trier of fact understand the evidence or to determine a fact issue and . . . expert testimony concerning the status of the law does not tend to accomplish either of these goals." 239 Neb. at 628, 477 N.W.2d at 560, citing *Sasich v. City of Omaha*, 216 Neb. 864, 347 N.W.2d 93 (1984).

Because Johnson's deposition testimony involved the duties of OPPD and Hotline to warn Schmidt, that testimony was properly stricken by the trial court, those matters being questions of law. Thus, Schmidt's third assignment of error is without merit.

## V. CONCLUSION

We reverse the trial court's orders of summary judgment in favor of OPPD and Hotline and remand the causes to the district court for further proceedings.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.