Dean BUSING and Concrete Industries, Inc., a Nebraska Corporation, d/b/a Western Sand & Gravel Company, Plaintiffs,

v.

ELECTRONIC POWER DESIGN, INC., a Texas Corporation, and Steven G. Smith, Defendants.

No. 4:96CV3295.

United States District Court, D. Nebraska.

Nov. 19, 1997.

---

Charles H. Wagner, Edstrom, Bromm, Lindahl, Wagner & Miller, Wahoo, NE, for Plaintiffs.

John M. Guthery, Perry, Guthery, Haase & Gessford, P.C., Lincoln, NE, for Defendant Electronic Power Design, Inc.

J. Arthur Curtiss, Grimit & Witt, Lincoln, NE, for Defendant Steven G. Smith.

## MEMORANDUM AND ORDER

KOPF, District Judge.

At the end of the plaintiffs'[1] case-in-chief, and after viewing the evidence in the light most favorable to Dean Busing (Busing), I granted Steven G. Smith's (Smith) motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). Busing sued Smith, together with an equipment supplier, contending that Smith had a duty under Nebraska law to warn him of the instability of a truck load.

Although I orally explained my reasons for dismissing the case against Smith, explaining my reasoning in greater detail is appropriate. I proceed to that task now.

### I.

Western Sand & Gravel Company employed Busing as the manager of that company. Busing is a large man. He weighed about 230 pounds when he was injured.

At a trade show in New Orleans Busing talked to a sales representative from Electronic Power Design, Inc. (EPD) about the purchase of heavy electrical equipment. After that conversation and through another company, Busing ordered three pieces of equipment from EPD. One piece of equipment was an "SCR." This piece of equipment was 90 inches tall and weighed more than one thousand pounds. Protruding from one side of the SCR was an "appendage" that housed a transformer. The other two pieces of equipment were large and heavy also. The equipment was intended to be welded to a barge and was designed to run a dredge motor.

Smith is an independent truck driver whom EPD engaged to haul the equipment from Texas to Nebraska. There is no evidence that Smith had ever dealt with EPD before the incident in question. There is also no evidence that Smith had ever dealt with Busing or Western Sand & Gravel before. There is no claim that Smith had any specialized experience with large pieces of electrical equipment, although Smith was an experienced truck driver.

Viewing the evidence in the light most favorable to Busing, I assume that when Smith went to pick up the equipment at the EPD plant an EPD employee told him that the SCR was unstable. As a result, Smith, with the help of the EPD employee, built a wooden brace for the SCR so that the SCR would not shift during the trip from Texas to Nebraska.

After that, in the presence of Smith, the electrical equipment, including the SCR, was loaded on Smith's flat-bed truck by EPD workers. The three pieces of equipment were placed on the truck so that each piece was very close to the other pieces. Smith lodged the brace he had built under the

---

**1.** As the employer, Concrete Industries, Inc., was named a nominal plaintiff by Busing so that it could protect its subrogation interest. Concrete Industries, Inc., did not actively participate in the trial of this case.

appendage of the SCR. The three pieces of equipment were then tied down using straps. The load was then covered with tarps, and they tied down the tarps also.

After loading was complete, Smith left Texas and drove to Nebraska. Smith arrived at Western Sand & Gravel at 9:00 p.m. Sunday, April 17, 1994. About an hour before arriving Smith called Busing and told Busing when the load would be arriving.

Busing was anxious to get the equipment unloaded because the dredging season was starting. Despite the late hour, Busing and two other employees of Western Sand & Gravel met Smith at Western's plant. Busing told Smith to park under some spot lights, and Busing and his men prepared to unload the truck.

Busing, Western Sand & Gravel, EPD and Smith anticipated that Western Sand & Gravel employees would unload the truck. Specifically, Busing did not expect Smith to play any part in the unloading, and, as Busing expected, Smith did not participate in that effort. As Busing was unloading the truck, Smith was looking after his equipment, including the tarps and straps. According to Busing, Smith's activity in looking after his own equipment was "what you would expect."

Because the equipment was heavy, it had to be unloaded by a crane. Western Sand & Gravel had its own crane. Busing told one of his men to get the crane, and the crane was moved to the place where they would unload the equipment. After that, in the glow of the lights, the three Western Sand & Gravel employees began the unloading process.

One of the Western Sand & Gravel employees operated the crane. Another served as an observer on the ground. Busing decided that he would hook the crane to the electrical equipment. To do this, Busing climbed on the flat-bed truck.

As Busing climbed on the truck, he could see how the three pieces of equipment were placed on the truck in relation to one another. At this time, the SCR was standing upright as it had been when it was loaded. Busing could observe the SCR. Busing also observed the brace that Smith had built.

Viewing the evidence in the light most favorable to Busing, I assume that the brace was no longer lodged under the appendage of the SCR. Although Busing saw the brace on the floor of the truck, I further assume that he did not know its purpose. Busing removed the brace from the floor of the truck, and threw it toward the rear of the vehicle.

Busing decided to unload another piece of equipment before unloading the SCR. To do this, Busing was required to hook the crane to the piece that was to be unloaded first. The electrical equipment had "eye bolts" on the top of the equipment so that a crane could be hooked to the equipment for unloading.

Using the rear deck of the truck, Busing climbed on the SCR. He then leaned from the SCR to the other equipment and attached the crane to the first item to be unloaded. A ladder was available to Busing for this purpose, but he elected not to use it. Busing used the step deck of the truck and then the SCR as his "ladder."

While standing on the SCR, Busing directed the crane operator to remove the first piece of equipment. As the crane was removing the first piece of equipment, the SCR began to tip. With Busing still standing on it, the SCR fell from the truck. Busing also fell. The SCR landed on Busing's foot crushing his toes. Busing's toes were later amputated.

A drawing of the SCR as it stood on the truck when Busing climbed on it is attached.[2] The drawing shows Busing standing on the SCR appendage. Busing admitted standing on the SCR appendage, but claimed that when the SCR fell he was standing on the top of the SCR rather than on the appendage. I have assumed that Busing's testimony is true for purposes of the Rule 50 motion.

Busing presented testimony from Frank Scarcella, an executive of Ranger Truck Lines. Ranger hauled the SCR to the EPD plant before Smith took the SCR to Nebraska. Scarcella testified about the custom and practice in "the trucking industry as to the

2. The drawing was received in evidence as exhibit 58.

type of warning ... [that] should be communicated to the people at the other end."

Scarcella stated that it was the shipper's responsibility, and not the driver's responsibility, to provide unloading warnings. According to Scarcella, the shipper customarily lists such instructions on the bill of lading or packing slips. The truck driver's sole responsibility, according to Scarcella, is to give the bill of lading or packing slips to the consignee.

It is undisputed that Smith gave Busing a bill of lading and delivery receipt before the unloading process. It is also undisputed that there were no unloading instructions on the bill of lading or delivery receipt that would have warned Busing about the alleged instability of the SCR. I further assume that Smith did not orally warn Busing about the alleged instability of the SCR.

## II.

■ The parties agree that Nebraska law applies in this diversity case. Nebraska law requires that before Smith may be held liable to Busing for failure to warn, Smith must have a "duty" to warn. *Schmidt v. Omaha Public Power District,* 245 Neb. 776, 786, 515 N.W.2d 756, 763 (1994) (applying a four-factor test, the Nebraska Supreme Court held that a "one-call" clearing house had a duty to warn callers that not all electrical lines were marked by the power companies). In other words, before a jury can determine whether Smith was negligent in failing to warn Busing, "there must be a legal duty on the part of [Smith] to protect [Busing] from injury." *Id.* Whether a "duty" exists is a question of law decided not by the jury but by the judge. *Id.* at 793, 515 N.W.2d at 767.

■ Viewing the evidence in the light most favorable to Busing, I find and conclude that Smith did not owe a "duty" to warn Busing. In so doing, and following the *Schmidt* case, I have examined the relationship of the parties, the nature of the attendant risk, the defendant's opportunity and ability to exercise care, and the public interest in Busing's proposed solution that Smith owed him a duty to warn. *Id.* at 788, 515 N.W.2d at 764 (following *Hopkins v. Fox &*

*Lazo Realtors,* 132 N.J. 426, 625 A.2d 1110 (1993)). The " 'policy characteristic of duty is one method that courts use to allocate the costs of injury in a manner that considers the interests of both society and the injured person.' " *Id.* at 787, 515 N.W.2d at 763 (quoting 4F Personal Injury, § 1.01[2⅓] [i] at 78 (Louis R. Frumer et al., eds., 1989)).

### The Relationship of the Parties

When the Nebraska Supreme Court probes the "relationship of the parties," it decides whether the parties have expectations, incentives or information regarding the risk of injury which flow from their relationship. *Id.* at 789–90, 515 N.W.2d at 764–65. An analysis of the relationship of the parties militates against the imposition of a duty to warn on truck drivers like Smith.

First, the parties did not expect Smith to warn Busing. Second, the relationship of the parties gave Smith no economic incentive to warn Busing. Third, Busing, as compared with Smith, was in the best position to obtain the greatest information from EPD about risks associated with SCR. I will explain.

Smith was a stranger to Busing and Western Sand & Gravel. In particular, he had no contract with either of them. There was no testimony that anyone expected Smith to provide safety information to the consignee of his load. On the contrary, Scarcella testified that truck drivers did not provide such warnings to consignees except to give them bills of lading and the like prepared by shippers. Furthermore, Busing testified that while he was unloading the equipment Smith was caring for his own equipment and that is "what you would expect." Thus, the relationship between the parties establishes no reasonable expectation that Smith would provide a warning to Busing regarding unloading.

In addition, it was Busing's responsibility to unload the truck. EPD paid Smith to drive a truck. No party paid him to unload it. Once Smith delivered the load to Busing for unloading, Smith no longer hand any economic interest in the equipment. Busing, on the other hand, having purchased the equipment, possessed a keen economic interest in insuring that he did not damage the SCR when he unloaded it.

Thus, the relationship of the parties allocated the incentive to unload the truck carefully to Busing and not Smith. Simply put, there was no monetary reason for Smith to be concerned about the unloading process; that is, Busing, rather than Smith, had the sole economic incentive to "insure" himself for risks associated with the unloading process.

Finally, apart from the fact that Smith learned the SCR was unstable when it was loaded, Busing, as compared with Smith, had the superior opportunity to discover risks associated with the SCR. This is because Busing, as the purchaser of the equipment, had a more significant relationship with EPD than did Smith, and EPD, as the supplier of the equipment, knew more about the risks associated with SCR.

Busing was buying the equipment from EPD. In addition, it was Busing's responsibility to unload the equipment using his employer's men and heavy equipment. Afterwards, Busing would manage the dredging operation while the SCR was operating. Smith, on the other hand, was only responsible for moving the equipment from Texas to Nebraska. He had no opportunity to know anything about the equipment beyond those minimal facts he learned during the few hours it took to load his truck. Summarily stated, Busing, as compared with Smith, was in the best position to obtain the most information from EPD about risks associated with SCR.

### The Nature of the Attendant Risk

When the Nebraska Supreme Court asks about the "nature of the attendant risk," the court examines questions of foreseeability. *Id.* at 790, 515 N.W.2d at 765. Here, the general nature of the risk did not make Busing's injury foreseeable to Smith. Moreover, the specific nature of the risk did not make Busing's injury foreseeable to Smith.

While not risk free, the task of unloading a truck does not generally present a risk of injury to people like Busing who contract to unload trucks. Millions of trucks are unloaded in this country annually without incident. Thus, there was no general reason for Smith to foresee injury to Busing.

Moreover, while Smith was aware of the instability of the SCR and I assume that Busing was not aware of that fact, the specific risk to Busing would have been hard for Smith to anticipate. Instead of using an available ladder, Busing elected to use the SCR as if it were a ladder. Because Busing knew that the SCR was electrical equipment he also knew that it was not intended to serve as a ladder.

Thus, the specific risk to Busing that allegedly required a warning occurred only when Busing selected a course of action that was both unexpected and obviously less safe than the common practice of using a ladder. Consequently, the risk that the SCR could fall on Busing if he used the unstable equipment as a ladder would not have been readily foreseeable and therefore would not reasonably provoke Smith to provide a warning.

### Smith's Opportunity and Ability to Exercise Care

When the Nebraska Supreme Court examines the "opportunity and ability to exercise care," the court examines the opportunity and ability of the defendant to provide a warning. *Id.* at 790, 515 N.W.2d at 765. Smith had the abstract ability and opportunity to warn Busing about the instability of the SCR; that is, Smith knew of the instability, he was in the general vicinity of the truck when they unloaded it and he could have told Busing about the instability.

Nevertheless, because the risk (the SCR might fall if Busing used it as a ladder) was not foreseeable, Smith's actual opportunity and ability to provide a warning was limited as well. There is no evidence that Smith knew or had reason to know that Busing would use the SCR as a ladder to unload the equipment. After all, it is undisputed that the unloading work was Busing's responsibility, and not Smith's responsibility. Furthermore, according to Busing, Smith was not paying particular attention to Busing as he crawled on the truck and scaled the SCR. In fact, Busing testified that while he was unloading the truck Smith was attending to his own equipment and that is "what you would expect."

In summary, Smith had a theoretical opportunity and ability to warn Busing. However, Smith had no actual opportunity or ability to warn Busing because the specific risk was not foreseeable to Smith. Consequently, this factor argues against the imposition of a duty to warn on Smith.

### Public Interest

Lastly, imposing a duty to warn on truck drivers like Smith would not serve the public interest. This is because independent truck drivers have no incentive, opportunity or ability to control the risk of unloading and thus shifting the risk to them would be economically inefficient. It makes better sense to allocate the risk of unloading to the shippers and the consignees who have control of the risk through their contracts. Moreover, here, unlike the defendant in the *Schmidt* case, the truck driver was not in "the business of public safety." *Id.* at 790, 515 N.W.2d at 765.

In summary, the public interest dictates that Busing should shoulder the risk he contracted for when he bought the electrical equipment and agreed to unload it. We should not spread the risk to truck drivers simply because they may know something about the load.

### III.

Giving Busing the benefit of the doubt, and viewing the evidence in the light most favorable to him, no duty to warn existed on Smith's part. All four factors considered by the Nebraska Supreme Court when deciding whether to impose a "duty" argue against the imposition of a duty to warn on truck drivers like Smith.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document against the plaintiffs and in favor of the defendant Steven G. Smith providing that the plaintiffs shall take nothing as against Smith and this case is dismissed with prejudice pursuant to Federal Rule of Civil Procedure 50(a).