RANDY REEDER, APPELLANT, V. THE STATE OF NEBRASKA
THROUGH THE DEPARTMENT OF SOCIAL SERVICES, APPELLEE.
578 N.W. 2d 435

Filed May 29, 1998.   No. S-96-937.

Denzel R. Busick and Daniel R. Fridrich, of Luebs, Leininger, Smith, Busick & Johnson, for appellant.

Don Stenberg, Attorney General, and Royce N. Harper for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

STEPHAN, J.

Randy Reeder, a recipient of public assistance for home health care services, brought this action against the State of Nebraska through its Department of Social Services (DSS) pursuant to Nebraska's State Tort Claims Act, Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1996). Reeder contends that DSS is vicariously liable for the negligence of a nurse whom it approved to provide services for him. In the alternative, Reeder contends that DSS breached an independent duty to provide adequate nursing services. Reeder appeals from an order of the district court for Hall County entering summary judgment for DSS. We determine that while the district court correctly found as a matter of law that DSS owed no independent duty to provide nursing services to Reeder, it erred in entering summary judgment for DSS because of genuine issues of material fact with respect to Reeder's alternative theory of recovery based upon respondeat superior.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewing the evidence in a light most favorable to Reeder, as is required in appellate review of a summary judgment, the facts are as follows: On May 5, 1990, Reeder was in an automobile accident which left him paralyzed below the neck, with limited use of his hands. Reeder was released from the hospital on March 4, 1991, and, due to his disability, required home health care. Reeder learned that Sheri Perales, a licensed practical nurse (LPN), was seeking employment and asked her if she would be interested in supplying certain services for him. Perales accepted the job.

DSS administers various programs, including the Aged and Disabled Medicaid Waiver program, through which state and

federal funds are used to provide home and community-based services to elderly and disabled persons in Nebraska. Under these programs, individuals requiring assistance usually choose their own service providers, but if requested, DSS will furnish a list of potential providers. Before becoming eligible to receive compensation under programs administered by DSS, a service provider is required to complete certain documentation and obtain DSS approval. This process includes an interview with a DSS caseworker, during which the provider is given a manual detailing services covered by the program. In addition, the case-worker usually obtains references and conducts a police check on the provider.

After agreeing to accept the position with Reeder, Perales completed the documentation necessary to be approved by DSS as a medicaid service provider in the capacities of personal care aide (PCA) and LPN. No special training was required to be a PCA, but before Perales could begin providing services to Reeder as an LPN, it was necessary for DSS to ensure that her Nebraska license was current. In the "Medical Assistance Provider Agreement[s]" which Perales signed in order to be a provider of services under programs administered by DSS, she agreed to follow DSS policies and procedures. The regulations applicable to LPN's define "[c]overed [s]ervices" as those "ordered by the client's physician based on medical necessity." 471 Neb. Admin. Code, ch. 13, § 002 (1990). The regulations define "[s]killed nursing services" as "those services provided by a registered nurse or a licensed practical nurse which s/he is licensed to perform. Private-duty nursing may be provided in the client's home or current living arrangement." *Id.* The regu-lations require DSS local office personnel to obtain the physi-cian's order for private-duty nursing services, "[a]uthorize the number of hours to be worked based on the physician's order and the client's medical need[,]" and submit certain documen-tation. 471 Neb. Admin. Code, ch. 13, § 005 (1990). The regu-lations also specify billing and payment procedures.

In March 1991, DSS obtained an order from Reeder's physi-cian which stated that he required the services of an LPN for 1 to 2 hours per day and a PCA for 4 to 5 hours per day. Subsequently, DSS developed a care plan for Reeder detailing

the types and frequency of services required. Beyond the terms of the care plan, DSS allowed Reeder and Perales to decide the details of their arrangement, such as the hours Perales would perform her duties.

Perales testified that she believed DSS to be her employer, but she also stated that during the time she was paid by DSS, she was self-employed. Perales also testified that DSS caseworker Dorelle Wilson was her supervisor and that Wilson "assured that . . . the care was given and [Reeder] had somebody there for his needs." Perales testified that occasionally Wilson visited Reeder's home to "make sure things were going okay." If Perales had any problems, she would notify Wilson and request assistance. Perales also notified Wilson if she needed to work more hours than were approved under the care plan, because additional hours had to be approved in order to be reimbursed by DSS. Paula Greenfield, a DSS supervisor, testified that Perales was not prohibited from performing additional, noncovered services for Reeder, but that if Perales did so, Reeder was responsible for paying her.

Greenfield testified that DSS is concerned about the safety of its clients. DSS conducts police checks before approving care providers and refuses to use a provider in the future if DSS becomes aware of any improper activity. DSS monitors the activities of care providers by reviewing the timesheets submitted with their bills. The timesheets include a brief statement of what services were performed in the billing period and are signed by both the provider and the client. In the present case, Perales was paid by the hour. No income taxes were withheld from her paychecks, but Social Security and FICA taxes were paid by the State for both Perales and Reeder.

DSS considered medicaid service providers such as Perales to be independent contractors. Providers received no insurance or other benefits and were not paid for overtime, holidays, or sick days. Greenfield testified that DSS was an "agent for monitoring and payment" and for distributing funds under government programs.

In May 1991, while Perales was providing services to Reeder, he developed decubitus ulcers on his heels. Reeder and Perales decided to take Reeder to a podiatrist for treatment of

this condition. Perales notified Wilson that Reeder had been seen by the podiatrist regarding the decubitus ulcers. Perales followed the podiatrist's orders in caring for Reeder. The ulcers never healed properly, and an infection developed. Reeder underwent a lengthy period of hospitalization and treatment, and may require amputation of his feet.

On December 30, 1993, Reeder filed suit against DSS pursuant to the State Tort Claims Act, alleging that DSS was negligent "[i]n failing to give appropriate instructions and training to the nurse it approved for the care of the Plaintiff" and "[i]n failing to exercise reasonable care in supplying and providing nursing services to the Plaintiff." In its answer, DSS alleged that there was no negligence on the part of any of its employees and that Perales "was a licensed practical nurse functioning as an independent contractor under a provider agreement and as such is not an employee" for whose negligence the State could be liable under the State Tort Claims Act.

DSS moved for summary judgment. During a hearing on the motion, the district court confirmed that Reeder was proceeding on two alternative theories of recovery: first, Perales was an employee of DSS, and DSS was vicariously liable for her negligence under the doctrine of respondeat superior; or, alternatively, DSS breached an independent duty to select and train a nurse who was competent to provide the services required by Reeder. In granting the motion for summary judgment, the district court held as a matter of law that no employment relationship existed between DSS and Perales and that "[t]he level of care paid for by [DSS] and furnished to [Reeder] was the level of care set forth by [Reeder's] own medical doctors . . . and by agreeing to pay for such care the role of [DSS] was satisfied." After his motion for new trial was overruled, Reeder perfected this appeal, which we have transferred to our docket on our own motion pursuant to our authority to regulate the caseloads of the Nebraska Court of Appeals and this court.

## ASSIGNMENTS OF ERROR

Reeder contends that the trial court erred in ruling as a matter of law (1) that Perales was an independent contractor and (2) that DSS fulfilled any duty it had with respect to Perales and did

not have an independent duty to provide adequate training and instructions for her.

### STANDARD OF REVIEW

In reviewing an order granting a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Brown v. Wilson*, 252 Neb. 782, 567 N.W.2d 124 (1997); *Kramer v. Kramer*, 252 Neb. 526, 567 N.W.2d 100 (1997); *Moore v. Eggers Consulting Co.*, 252 Neb. 396, 562 N.W.2d 534 (1997).

When reviewing a question of law, an appellate court reaches a conclusion independent of the lower court's ruling. *Fales v. Books*, 253 Neb. 491, 570 N.W.2d 841 (1997); *Wolgamott v. Abramson*, 253 Neb. 350, 570 N.W.2d 818 (1997).

### ANALYSIS

We address Reeder's alternative theories of recovery separately.

#### RESPONDEAT SUPERIOR

Under the doctrine of respondeat superior, an employer is held vicariously liable for the negligent acts of an employee committed while the employee was acting within the scope of the employer's business. *Kocsis v. Harrison*, 249 Neb. 274, 543 N.W.2d 164 (1996). DSS contends that Perales was an independent contractor and not an employee of DSS. An independent contractor is one who, in the course of an independent occupation or employment, undertakes work subject to the will or control of the person for whom the work is done only as to the result of the work and not as to the methods or means used. *Kime v. Hobbs*, 252 Neb. 407, 562 N.W.2d 705 (1997); *Pettit v. State*, 249 Neb. 666, 544 N.W.2d 855 (1996).

Ordinarily, a person's status as an employee or an independent contractor is a question of fact. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law. *Kime v. Hobbs, supra*; *Pettit v. State, supra*. We have held that there is no single test for determining whether one performs services for another as an employee or as an inde-

pendent contractor and that the following factors must be considered: (1) the extent of control which, by the agreement, the employer may exercise over the details of the work; (2) whether the one employed is engaged in a distinct occupation or business; (3) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (4) the skill required in the particular occupation; (5) whether the employer or the one employed supplies the instrumentalities, tools, and the place of work for the person doing the work; (6) the length of time for which the one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business. The right of control is the chief factor distinguishing an employment relationship from that of an independent contractor. *Omaha World-Herald v. Dernier*, 253 Neb. 215, 570 N.W.2d 508 (1997); *Kime v. Hobbs, supra*; *Pettit v. State, supra.*

On a motion for summary judgment, the question is not how a factual issue is to be decided, but whether any real issue of material fact exists. *Kime v. Hobbs, supra*; *Melick v. Schmidt*, 251 Neb. 372, 557 N.W.2d 645 (1997); *State Farm v. D.F. Lanoha Landscape Nursery*, 250 Neb. 901, 553 N.W.2d 736 (1996). Thus, the specific issue before us is not whether Perales was a DSS employee, but whether it can be determined as a matter of law that she was not.

Both parties rely on *Pettit v. State, supra*, a workers' compensation case in which the key issue was whether Pettit, who was injured while working as a "chore provider" for a DSS client under the Medicaid Waiver Program, was an employee of DSS. The facts in *Pettit* closely parallel those in this case. The Medicaid Waiver Program permits low-income clients to have the assistance of chore providers in their own homes as an alternative to nursing home care. Under this program, DSS serves as an intermediary between the client and the chore provider, ensuring that state and federal criteria and health and safety needs are met. DSS also distributes the state and federal funds used to pay the chore providers.

Pettit, who held a respite care certificate, was interviewed and approved by the client, who also had authority to terminate her assistance. DSS specifically advised Pettit that she was an independent contractor who worked for the client. Pettit's W-2 form listed the client as her employer and DSS as the client's agent. No federal income tax was withheld from Pettit's earnings. Pettit's job tasks were set out in a signed agreement between Pettit and DSS. In the agreement, Pettit agreed to provide service only as authorized by DSS standards. DSS also provided Pettit with a handbook which defined the services she was to provide to the client. DSS informed Pettit of what services needed to be performed, but Pettit and the client established the daily routine of how to get the tasks accomplished. On one occasion, DSS reprimanded Pettit for leaving the client alone in the bathtub.

Pettit was authorized to work a maximum of 40 hours per week and was responsible for recording her hours. She submitted a calendar showing the hours worked to DSS, which then paid her by mail. Pettit also received additional compensation directly from the client. Pettit was injured while serving as a chore provider, and DSS terminated her relationship with the client because the client's health and safety needs could no longer be met.

The Workers' Compensation Court held that Pettit failed to prove that she was an employee of DSS. The Court of Appeals reversed, and held as a matter of law that Pettit was a DSS employee. We reversed the decision of the Court of Appeals and held that the question whether Pettit was an employee or an independent contractor was a factual question and that the Workers' Compensation Court was not clearly wrong in finding that an employment relationship had not been proved. In reaching this conclusion, we specifically found that the record reflected "a factual dispute as to whether DSS had such control over Pettit as to create a DSS employer-employee relationship" and that "more than one reasonable inference can be drawn from the facts as to whether Pettit was an employee or an independent contractor." 249 Neb. at 674, 544 N.W.2d at 861.

Our review of the record in this case leads us to the same conclusion. Based upon the evidence summarized above, we

determine that more than one reasonable inference can be drawn as to the critical issue of the nature and degree of control exercised by DSS over Perales. In essence, DSS argues that this case is distinguishable from *Pettit* in that Perales provided health care to Reeder, while Pettit was merely a chore provider. While we agree that this fact is relevant to the issue of control, we do not regard it as determinative as a matter of law. We therefore conclude that the district court erred in finding as a matter of law that Perales was not an employee of DSS.

## INDEPENDENT DUTY

Reeder argues that even if Perales was an independent contractor, DSS "had a separate, independent, and non-delegable duty to supply Mr. Reeder with a care provider fully capable of meeting all of his daily nursing needs." Reply brief for appellant at 3. Reeder contends that this duty arose from Neb. Rev. Stat. § 68-1513 (Reissue 1996), which states that DSS "shall review the needs of each family or disabled person receiving support under sections 68-1501 to 68-1519 on a regular basis, as established by the department, or upon the showing of a change of circumstances by the head of the family," and from Neb. Rev. Stat. § 68-1515 (Reissue 1996), which states that DSS "shall adopt and promulgate rules and regulations, as necessary, to implement sections 68-1501 to 68-1519, including . . . [s]tandards and procedures for determining approval of qualified programs and services . . . ." Reeder argues that because DSS caseworkers have sometimes contacted clients' physicians directly, Reeder's caseworker had a duty to contact Reeder's physician, rather than his podiatrist, when she learned that Reeder was suffering from decubitus ulcers.

The question whether a legal duty exists for actionable negligence is a question of law dependent upon the facts in a particular situation. *Whalen v. U S West Communications*, 253 Neb. 334, 570 N.W.2d 531 (1997); *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 248 Neb. 651, 538 N.W.2d 732 (1995). In defining the concept of legal duty, we have quoted the following passage from W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53 (5th ed. 1984): " ' "Duty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is

always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. . . .'" *Anderson/Couvillon,* 248 Neb. at 658, 538 N.W.2d at 738 (quoting *Schmidt v. Omaha Pub. Power Dist.,* 245 Neb. 776, 515 N.W.2d 756 (1994)). Foreseeability is also a factor in establishing a defendant's duty. *Id.*

We do not read §§ 68-1513 and 68-1519 as conferring a duty upon DSS to directly provide or ensure a certain level of nursing care to persons who qualify for public assistance. Those sections are included in the Disabled Persons and Family Support Act, Neb. Rev. Stat. §§ 68-1501 to 68-1519 (Reissue 1996), pursuant to which DSS is authorized to provide financial support for equipment and services necessary to assist disabled persons in independent living situations, see § 68-1504. Read in this context, the statutory requirement that DSS review needs of aid recipients and develop standards and procedures for determining qualified programs and services is related to a statutory duty to provide compensation for health services, not a duty to provide the actual services. DSS caseworkers who serve clients receiving public assistance are not licensed health care professionals and are not authorized to make medical decisions or judgments. The fact that they maintain periodic contact with clients who receive health care benefits pursuant to the act and maintain a general interest in their welfare does not, in our judgment, amount to an undertaking to qualitatively assess or intervene in health care provided to the clients.

Reeder relies on *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs., supra,* in support of his argument that DSS had an independent duty to protect him from injury. In *Anderson/ Couvillon,* we held that where DSS had specific knowledge about the dangerous propensities of a child whom it placed in a foster home, it had a duty to disclose this information in response to a direct question about the child's behavioral history posed by the prospective foster parent prior to placement. We reasoned that because DSS had ample information about the child's violent and abusive behavior, the risk of harm to other children in the prospective foster home was foreseeable, and therefore, DSS had a duty to respond truthfully to the specific inquiry made by the foster parent.

In this case, there is no evidence that DSS ever had knowledge that home nursing services provided by Perales posed any risk of injury to Reeder. Reeder's physician determined that Reeder required home nursing care at the level provided by an LPN, and DSS verified Perales' licensure by the state before compensating her for services she provided to Reeder. There is no evidence that Reeder or anyone else complained to DSS about any services provided by Perales, or that DSS was ever advised that Reeder's medical and nursing needs were not being met during the time period when his injuries allegedly occurred. Although there is evidence that Perales advised the DSS caseworker in May 1991 that Reeder had developed decubitus ulcers on his feet for which he sought treatment by a podiatrist, there is no evidence that Reeder, Perales, the podiatrist, or anyone else advised DSS that Reeder required a different or higher level of home nursing care. Under these circumstances, we conclude that DSS had no independent duty to take any affirmative action with respect to the nature or scope of health care services provided to Reeder in the absence of an employment relationship between DSS and Perales, the existence of which we do not decide.

In summary, we conclude that the district court was correct in holding, as a matter of law, that DSS had no independent duty to provide nursing services to Reeder. However, the district court erred in holding, as a matter of law, that Perales was not a DSS employee; therefore, we reverse the judgment of the district court and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.